## The Inhbts. of FAYETTE vs. The Inhbts. of LEEDS.

In a case of the contested settlement of a pauper, it was held by the Court : —
That the settlement of an illegitimate child was in the town where the moth-
er had her settlement, at the time of its birth.

That such child could not lose this settlement, and acquire a new one, in her
own right, until emancipated from the control of the mother as a natural
guardian.

And that, the adjudication of the Court of Common Pleas, by which the custo-
dy of the child was committed to the putative father, and his exclusive sup-
port, and actual control of her for a period of sixteen years, worked no such
emancipation.

Nor was she emancipated by the marriage of the mother and removal to another
town ; — nor by the mother's becoming a pauper herself.

So that in neither of the cases aforesaid could the pauper child, gain a settle-
ment in a town by virtue of *a dwelling and having her home there* on the 21st
of *March*, 1821, pursuant to the provisions of statute, *ch*. 122, *sec*. 1.

THIS was an action of *assumpsit*, brought to recover for sup-
plies furnished a pauper, and was submitted for the decision of
the Court, upon the following agreed statement of facts.

*Laura Ann Josselyn*, the pauper, was the illegitimate daugh-
ter of *Temperance Swift*, and was born in the town of *Leeds* in
the year 1811 ; said *Temperance Swift* at that time having her
legal settlement in that town. The mother commenced a pro-
secution against one *Ezra Josselyn*, then an inhabitant of the
town of *Fayette*, in which prosecution he was ultimately adjudg-
ed the putative father of the said *Laura Ann* ; and *Josselyn*
thereupon gave bond with surety to the said *Temperance Swift*,
to pay her the sums awarded to be paid, by the Court ; and also
a like bond to the town of *Leeds*, to save it harmless from all
costs and charges that said town might incur for the support of
said child.

In the year 1813, *Josselyn* filed a petition in the Court of
Common Pleas, for this county, praying that the custody of the
said *Laura Ann* might be committed to him, which, after a
hearing of the parties, was granted. In 1817, *Josselyn* bargain-
ed with one *Josiah Elkins*, then, and ever since, resident in the

town of *Fayette*, to take and support the said *Laura Ann* until she should arrive at the age of eighteen, which he accordingly did, *Josselyn* paying him therefor at the rate of thirty dollars by the year. During all this time, from 1817 to 1829, the mother furnished her daughter with no portion of her support, nor exercised any control over her.

In 1815, or 1816, the said *Temperance Swift* was married to one *Ebenezer Clough*, whose legal settlement was in the town of *North-Yarmouth* ; — and about the year 1819, she removed to *North-Yarmouth*, and has ever since resided there, supported by that town.

*Sprague*, for the plaintiffs, relied in the opening, upon the following authorities to show that the pauper had her legal settlement in the town of *Leeds*. *Pittston v. Wiscasset*, 4 *Greenl.* 293 ; *Lubec v. Eastport*, 3 *Greenl.* 220 ; *Hale v. Gardiner*, 1 *Greenl.* 93 ; *Somerset v. Dighton*, 12 *Mass.* 383 ; *Winchendon v. Hatfield*, 4 *Mass.* 123 ; *Taunton v. Plymouth*, 15 *Mass.* 203.

To show the extent of an illegitimate mother's rights, he cited, *Wright v. Wright*, 2 *Mass.* 109; *Somerset v. Dighton*, 12 *Mass.* 383 ; *Petersham v. Dana*, 12 *Mass.* 429.

That a person supported in one town, at the expense of a person residing in another, does not gain a settlement in the former town, he cited, *Southbridge v. Charlton*, 15 *Mass.* 248.

*Allen*, for the defendants, contended that the settlement of the pauper was fixed in the town of *Fayette* by her residence there on the 21st of *March*, 1821, by virtue of the provisions of *stat.* of 1821, *ch.* 122, *sec.* 1. She was then ten years of age — the father had the legal control of her — and wherever he chose to place her and provide for her there was her home.

The pauper was emancipated from the control of her mother ; — 1. By the adjudication of the Court in 1811, whereby *Josselyn* was charged as the father. 2. By the additional adjudication in 1813, by which the pauper was placed under the control of *Josselyn*. 3. By the marriage of the mother to *Clough*, in 1816. 4. By the poverty of the mother, who in 1819, became a pauper herself.

In support of these positions he cited, *Boothbay v. Wiscas-*

set, 3 *Greenl.* 354 ; *St. George v. Deer-Isle*, 3 *Greenl.* 390 ; *Lubec v. Eastport*, 3 *Greenl.* 220 ; *Sidney v. Winthrop*, 5 *Greenl.* 123 ; *Commonwealth v. Hamilton*, 6 *Mass.* 273 ; *Spring v. Wilbraham*, 4 *Mass.* 493 ; *Nightingale v. Withington*, 15 *Mass.* 272 ; *State v. Smith*, 6 *Greenl.* 462.

And being emancipated, she was rendered capable of gaining a settlement in her own right.

The case cited by the defendants' counsel to show that a person supported in one town by a person residing in another, does not thereby gain a settlement in the former town, has no application to this case ; for here, *Josselyn, Elkins*, and the pauper, all resided in the same town, *Fayette*.

The case of *Pittston v. Wiscasset* is unlike this — here the child was illegitimate — there it was not. There the father retained the right to reclaim his daughter — here the mother had no right, the father having the control of the daughter by order of Court.

In *Somerset v. Dighton*, it is true, the Court say that emancipation is not to be presumed. But here we have *proof* — or circumstances from which it may be fairly inferred.

*Sprague*, in reply, insisted that the cases cited for the defendants were all unlike this. In none of them was it decided that an emancipation took place while the parents or either of them were living.

As to the 2d cause of emancipation stated by defendants' counsel, he was not aware that the Court of Common Pleas under the then existing law, had power to change the settlement of the child — or indeed that it had the legal power to deprive the mother of the control of the child, and transfer it to the putative father. The act of the Court of Common Pleas was in this respect merely void.

If the Court do not recognize the rights of the putative father to the control of this child, then the mother had the legal control, and of course, there was no emancipation. If the Court do recognize his rights, then there was no emancipation, for he was supporting her by *Elkins*, his agent.

No decision can be found shewing that the marriage of the mother emancipates the child. The same reasons assigned by

Fayette v. Leeds.

the counsel for the defendants, would apply to the case of a widow with children by a former husband, in which case no one would contend, that on the second marriage they thereby become entirely emancipated.

WESTON J. at a subsequent term, delivered [the opinion of the Court.

The settlement of the mother, at the time of the birth of the pauper, an illegitimate child, was in the town of *Leeds*. This fixed the settlement of the pauper there, where it would by law remain, until she gained one in some other town. It is insisted that, she subsequently gained a settlement in *Fayette*, in virtue of the act of *March* 21, 1821, where it is contended she then dwelt and had her home.

It appears that one *Elkins*, an inhabitant of *Fayette*, in *July*, 1817, gave a bond to the putative father to indemnify and save him harmless from any expense and trouble arising from her support, until she should become eighteen years of age. In pursuance of this undertaking, the pauper resided in the family of *Elkins*, from that time, until after the passage of the law before adverted to, when she was about ten years old. We are not apprized of the reasons, which induced the Circuit Court of Common Pleas, in 1813, to commit the child to the keeping of the putative father for support, until the further order of Court. It was an arrangement to which the mother was constrained to submit, or to forego all further assistance from the father; as it was doubtless competent for the Court to determine for what period, and to what extent, he should be chargeable. But it was not in the power of the Court to emancipate the child from its mother. Her parental rights remained in full force, and might be exerted by her, whenever she might think proper to reclaim the child; although she would thereby take upon herself the entire burden of its support.

This right was expressly recognized in *Wright v. Wright*, 2 *Mass.* 109. *Parsons C. J.* there says, that the custody and control of an illegitimate child belongs to its mother, as its natural guardian. And the doctrine of this case is sustained in *Somerset v. Dighton*, 12 *Mass.* 382; and it is there further sta-

Fayette *v.* Leeds.

ted, as resulting therefrom, that an illegitimate child ought not to be separated from its mother, while a minor, without her consent. It does not appear that the mother was assenting or even privy to the placing of the child in the family of *Elkins*. In the cases cited for the plaintiffs, it has been repeatedly holden that a minor cannot gain a settlement in his own right, until emancipated, and that emancipation is not to be presumed.

Nor has it been at any time decided, that parental authority or control ceases, when the parent becomes a pauper. While supported by the town, its exercise may be somewhat restrained or modified by the power, which acts upon the parent; but that restraint ceases, whenever the parent is in a condition to support himself and family. Even while receiving partial assistance from the town, he may lawfully avail himself of the labour and earnings of his minor children. Nor did the marriage of the mother emancipate the child. This point was also decided in the case of *Wright v. Wright*, before cited, it being there held, that the natural right of guardianship in the mother devolves on her husband on the marriage. It results that there being no emancipation, no change of settlement is proved, and that the plaintiffs are entitled to judgment.